[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 10, 2006
THOMAS K. KAHN
CLERK

No. 04-16451

_____

NLRB  No. 10-CA-32024

NATIONAL LABOR RELATIONS BOARD,

                                                                  Petitioner-
                                                                  Cross-Respondent,

versus

CHUGACH MANAGEMENT SERVICES, INC.,

                                                                  Respondent-
                                                                  Cross-Petitioner.

_____

Petitions for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board
_____

**(January 10, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

PER CURIAM:

The National Labor Relations Board has applied to this Court for enforcement of its order requiring Chugach Management Services, Inc., to take remedial action, including full instatement of Anthony Jones and payment of damages to him. That order resulted from the Board's affirmance of an administrative law judge's finding that Chugach had discriminated against Jones in violation of Section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1). A two-member majority of the Board agreed with the ALJ that Chugach did not hire Jones because of animus towards Jones resulting from his protected union activities. Chugach cross-petitions for review of the Board's order and asks that we deny the Board's application for enforcement.

In the course of its decision, the Board found that Chugach had failed to meet its burden of showing that it would not have hired Jones even in the absence of his union activities. Because we conclude that finding is not supported by substantial evidence in the record as a whole, we grant Chugach's petition for review and deny the Board's application for enforcement of its order.

## I.

From 1994 through September 1999, Anthony Jones worked as a high voltage lineman for Northrop Grumman at Redstone Arsenal, a United States Army installation near Huntsville, Alabama. In 1999, Northrop employed nine

other linemen at the Arsenal. Rex Moss supervised the linemen, and Billie Scillian was program manager for Northrop at the Arsenal.

While employed by Northrop, Jones and his fellow linemen were members of the International Brotherhood of Electrical Workers, Local Union No. 558. In 1995, Northrop and the Union entered into a collective bargaining agreement generally referred to as the "Red Book" by management and Union members.

In 1996 and 1997, Northrop and the Union had several conflicts involving Northrop's overtime policies. Jones featured prominently in these conflicts. In early 1996, Jones filed a grievance accusing Moss of failing to equalize overtime among linemen. In May 1997, Jones filed another grievance after he was suspended for declining to work overtime when he was off duty. Around the same time, Jones and lineman Jeff Creel, who also had filed a grievance, sought the support of other linemen in challenging Northrop's overtime policies.

In July 1997, Scillian and the Union executed an overtime agreement that supplemented the Red Book by clarifying the procedures for allocating overtime. Even after this agreement, Jones continued to complain to Moss and to other employees about Northrop's overtime policies. However, Jones never again refused to work overtime.

In August 1999, the Army contracted with the respondent, Chugach Management Services, Inc., to replace Northrop effective October 1, 1999.

Chugach initially hired several members of Northrop's management at the Arsenal, including Moss and Scillian. Scillian then directed the supervisors, including Moss, to interview all of the applicants for jobs with Chugach, identify the best people, and rank them.

All ten of the Northrop linemen completed Chugach job applications, and Moss interviewed them individually. During each interview, Moss gave a copy of Chugach's lineman job description, which was the same job description used by Northrop, and read it to the applicant. The job description contained a number of requirements, including: "When required, must be willing to work overtime and in inclement weather."

Moss' and Jones' accounts of the interview differ, but they are similar enough in describing Jones' reaction to the Chugach job description. Moss states that when he asked Jones whether Jones would abide by the job description, Jones said that "he would have to go by the Red Book . . . because the job description meant nothing to him." Moss states that Jones repeatedly referred to the Red Book throughout the interview with Moss. Jones testified that he did not refer to the "Red Book" but that he did say "I'll just go by the Bargaining Agreement" when Moss started to read the job description to him.

Moss submitted the following written recommendation of Jones after the interview:

When interviewed Anthony said he would not work over time, callouts or [i]n inclement weather. Anthony was very uncooperative and did not want to answer any questions.

Anthony is very disruptive and tries to keep creating problem[s] with myself and the other linemen.

I recommend that Anthony not be rehired, and replaced with another lineman. Anthony does not put forth any effort to help the company or any one else to make this job easier for every one. Anthony seems total[l]y unsatisfied with his job and with [the] company.

In an affidavit, Moss offered the following explanation of the comments in his written recommendation not to hire Jones:

During the interview, I specifically asked Anthony if he would be willing . . . to work overtime and in inclement weather. Anthony said NO. It meant nothing to him, that he would go by the Red Book. From those comments from Anthony I based the first comment of my interviewer comments.

I continued to ask him questions and he would only say that it didn't matter to him, he would just go by the Red Book. No other employees referred to the Red Book.

The basis of my second statement, that Anthony was very uncooperative and didn't want to answer any questions, was by his answering that he just wanted to go by the Red Book on a number of questions.

In the interview results section, I commented that Anthony is very disruptive and tries to keep creating problems. This comment was not based on the interview, but just from working with him for the past 5-10 years. A number of employees talking to me about Anthony griping is what I was referring to.

On one occasion, when Jeff Creel and Anthony refused to work overtime, they encouraged other employees to back them and their efforts and refuse to

5

work overtime. A number of employees . . . came to me to tell me what Jeff and Anthony were saying and that they did not support Anthony and Jeff in refusing to work overtime. It was Anthony and Jeff's refusal to work overtime that led to their discipline and then led to the grievance that led to the July 24, 1997 Memo/agreement.

Anthony kept picking on this . . . agreement about overtime. He came to me and, he went to others and complained.

Moss favorably recommended the other nine linemen, all of whom accepted Chugach's lineman job description requirements without qualification. In late August or early September, after the interviews were completed, Scillian informed Moss that Chugach was only going to hire nine linemen. Scillian then reviewed Moss' recommendations and spoke with Moss and another Northrop supervisor about each applicant. Chugach hired all of the Northrop linemen except Jones.

Chugach and the Union entered into a new collective bargaining agreement on September 30, 1999. On October 20, 1999, the Union filed with the NLRB a charge against Chugach arising from the Jones situation.

On July 10, 2000, the administrative law judge issued a decision finding that Chugach violated NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1). Two years after the ALJ's decision, the Board remanded for additional credibility determinations and factual findings. On September 24, 2002, the ALJ issued a supplemental decision and order, again finding that Chugach violated § 8(a)(1).

6

In a split decision dated July 30, 2004, the Board affirmed the ALJ's rulings, findings, and conclusions and ordered full instatement of Jones with back pay. Chugach Mgmt. Servs., Inc., 342 NLRB No. 69 (2004). The Board subsequently denied Chugach's motion for reconsideration. The Board applied to this Court for enforcement of the Board's order, and Chugach cross-petitioned for review of that order.

## II.

The parties both argue this case under the analytical framework set out in FES (A Division of Thermo Power), 331 NLRB 9 (2000), enforced 301 F.3d 83 (3rd Cir. 2002). That is also the framework the ALJ and the Board applied. We will, as well. Under FES, in a discriminatory refusal-to-hire case, the NLRB General Counsel has the initial burden to show: "(1) that the [employer] was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire . . . ; and (3) that antiunion animus contributed to the decision not to hire the applicants." FES, 331 NLRB at 12. After the General Counsel establishes a prima facie case of discriminatory refusal to hire, "the burden will shift to the [employer] to show that it would not have hired the applicant[] even in the absence of [his] union activity or affiliation." Id. Because an employer has the opportunity to shoulder that burden, we have

7

stated that an ALJ and the Board "may not attribute dispositive force to an employer's unlawful motivation." Northport Health Servs., Inc. v. NLRB, 961 F.2d 1547, 1551 (11th Cir. 1992) (remanding a case where the Board did not discuss whether the company proved that it would have discharged the employees regardless of their union involvement).

### III.

Addressing the prima facie case, the Board found that Jones had relevant training and experience for the lineman position since he had worked at that position for several years. The Board also found that the General Counsel had shown that Jones' protected conduct contributed to Moss' decision not to recommend Jones for a job with Chugach. The Board agreed with the ALJ that Jones' repeated references to the Red Book during the interview "reminded" Moss of Jones' protected union activities protesting Northrop's overtime policies in 1997. Direct evidence supported this conclusion. Moss admitted in his affidavit that his comment in the written recommendation that Jones "is very disruptive" and "tries to keep creating problem[s]" referred to both (1) Jones' refusal to work overtime, done in concert with another lineman, and (2) Jones' attempts to get other employees to join their protest.

The Board found that Chugach failed to meet its rebuttal burden because the two primary reasons given by Moss for not hiring Jones did not establish a

8

legitimate defense. First, the Board reasoned that Moss' statement that Jones "is very disruptive and tries to keep creating problem[s]" constituted the violation, not a defense. Second, the Board found that Moss' statement that Jones would not work overtime or in inclement weather was simply untrue.

The Board's dissenting member focused on the fact that "Jones [was] the only one of the job applicants who did not answer affirmatively when asked whether he would be willing to work overtime or in inclement weather." He believed that "Moss reasonably interpreted Jones' responses to his questions as, at a minimum, an unwillingness to work overtime . . . ." The dissenter would have reversed the ALJ on the ground that Moss' statement in his written recommendation that Jones "said he would not work over time, callouts or [i]n inclement weather" reflected Jones' "repudiation" of the job requirements and provided Chugach with a legitimate reason for not hiring Jones.

Responding to the dissent, the Board's majority acknowledged that Chugach "might lawfully have refused to hire Jones because he placed a limitation on his willingness to work overtime . . . or because he insisted on working in accordance with the Northrop collective bargaining agreement, which [Chugach] was not bound to adopt." The Board reasoned, however, that Chugach "did not assert either of those reasons" and that since Moss' only stated ground—"that Jones

9

would not work overtime"—was untrue, Chugach had failed to meet its rebuttal burden.

## IV.

In this type of proceeding, we "will accept the Board's factual determinations and reasonable inferences derived from these factual determinations if they are supported by substantial evidence on the record considered as a whole." BE&K Constr. Co. v. NLRB, 133 F.3d 1372, 1375 (11th Cir. 1997). Not only that, but "[w]e must also give special deference to the ALJ's credibility determinations . . . unless they are inherently unreasonable or self-contradictory." NLRB v. McClain of Ga., Inc., 138 F.3d 1418, 1422 (11th Cir. 1998) (citation omitted). Nonetheless, we keep in mind that "this Court is an independent appellate court and does not function simply as the Board's enforcement arm." Ona Corp. v. NLRB, 729 F.2d 713, 719 (11th Cir. 1984).

## V.

For the purposes of this opinion, we will assume that the NLRB General Counsel met its burden of establishing a prima facie case and will focus our attention on whether Chugach carried its rebuttal burden of showing that it would not have hired Jones regardless of his protected activities.

Essential to the Board's decision on the rebuttal issue is its finding that, despite Moss' assertion to the contrary, Jones never flatly refused to work

10

overtime. The Board did acknowledge that Chugach "<u>might</u> lawfully have refused to hire Jones" if he had limited his willingness to work overtime or had agreed to work overtime only as provided in the Northrop collective bargaining agreement. To the extent the Board meant to hedge with "might," that hedging is unjustified. There simply is no question that an employer can make hiring decisions on the basis of whether a prospective employee is willing to make an unconditional commitment to comply with the lawful requirements of the job. Nor is there any question that one of the requirements for this job was a willingness to work overtime. Jones does not dispute that the written job description said: "When required, must be willing to work overtime and in inclement weather."

As to Jones' not committing to work overtime unless it was required by the collective bargaining agreement, it is undisputed that there was no collective bargaining agreement between Chugach and the Union at the time. Nothing prevents an employer from declining to hire an applicant because he conditions his willingness to comply with job requirements on an agreement that is not in force.

Nonetheless, the Board rejected Chugach's contention that even if there was anti-union animosity it would not have hired Jones anyway because of the answer he gave to whether he would comply with the job requirements, which included working overtime. The sole reason the Board gave for rejecting that rebuttal contention is that Moss stated, and Chugach asserted, that Jones had refused to

11

work overtime. That was not true, the Board reasoned, because Jones did not flatly refuse to work overtime; he simply refused to commit to working overtime unless it was required under the collective bargaining agreement—an agreement that was not then in effect.

The Board's reasoning elevates form over substance and ignores the obvious. Moss' interpretation of the answer Jones admits giving seems reasonable to us. But even if Moss did read more limitation than he should have into Jones' failure to give a straight answer to whether he would be willing to abide by the job requirements, that still does not justify the Board's decision. The undisputed fact remains that Jones, and Jones alone out of all the applicants, did not commit without qualification to the job requirements including working overtime. The ALJ found that, "[b]ased on Jones' testimony and Moss'[] pretrial affidavit, . . . Jones only refused to work overtime which would be inconsistent with the [collective bargaining agreement]." Even under that interpretation of the facts, which we accept, the point is that Jones alone qualified his willingness to work overtime on a contract not in force at the time, a contract whose protections he could not claim.

There is no dispute in the record that a willingness to work overtime was, as the "Redstone Arsenal Program Job Description" for "High Voltage Electrician/Lineman" put it, one of the five "Essential Job

12

Elements/Requirements." Moreover, there is no evidence in the record that any of the other job applicants qualified in any way his willingness to accept the five essential job elements or requirements including working overtime. Jones singled himself out in that respect.

The situation confronting Chugach was that it had ten applicants for nine positions. Nine applicants had committed without qualification to the essential requirements of the job, and one had not. It is irrational to decide, as the Board implicitly did, that an employer in that situation would hire the one who had not committed to the job requirements in place of one of those who had. It follows that the Board's decision does not make sense, or to put it more technically, that the decision is not supported by substantial evidence in the record as a whole.

Chugach's cross-petition is GRANTED. The Board's application for enforcement of its order is DENIED.

13